MARK POE (S.B. #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
VICTOR MENG (S.B. #254102)
  vmeng@gawpoe.com
FLORA VIGO (S.B. #239643)
  fvigo@gawpoe.com
GAW | POE LLP
One Embarcadero, Suite 1200
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAFE HARBOR TREATMENT CENTER FOR WOMEN, INC., a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>PINNACLE HEALTH GROUP LLC, a Delaware Limited Liability Company; ARISE TREATMENT HOMES LLC, a California Limited Liability Company; and DOES 1-10,<br><br>Defendants. | Case No. 8:25-cv-00703-KES<br><br>**SECOND AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Safe Harbor Treatment Center for Women, Inc. alleges as follows:

## JURISDICTIONAL STATEMENT

1.    The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a Lanham Act claim under federal law.

2.    The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiff is a citizen of California and a substantial part of the events and omissions giving rise to this claim occurred in Orange County, California, where Plaintiff has its principal place.

## PARTIES

4.    Plaintiff Safe Harbor Treatment Center for Women, Inc. ("Safe Harbor") is a substance abuse treatment center located in Costa Mesa.  It is a California corporation headquartered in Mission Viejo.

5.    Defendant Pinnacle Health Group LLC is a Delaware Limited Liability Company with its principal place of business in Boca Raton, Florida.

6.    Defendant Arise Treatment Homes LLC is a California Limited Liability Company with its principal place of business in Los Angeles.

## FACTUAL ALLEGATIONS

7.    Safe Harbor was established as an addiction treatment center in 1993, primarily focusing on serving women recovering from substance use disorder.  In 2018 it was acquired from its founders by its current owners and certain other partners.  In February 2020 its current owners bought out the other partners, assuming full ownership and operational responsibilities.

8.    In 2022, Safe Harbor's owners decided to bring in a management company to take over operational responsibilities for the facility.  After briefly engaging one management company, in June 2022 Safe Harbor engaged Defendant Pinnacle Health Group LLC ("Pinnacle") to take over all operational

- 2 -

responsibilities for the facility, pursuant to a Management Services Agreement ("MSA") between the two companies.

### The Management Services Agreement

9.    Under the MSA, Safe Harbor remains the owner of the treatment facility, while Pinnacle is to "undertake all day-to-day administrative determinations and operations relating to the business of Safe Harbor" at the designated facility.  Among other responsibilities, Pinnacle is to:

(A)  "periodically develop[ ] and recommend[ ] business plans and other strategic initiatives for the growth and improvement of" Safe Harbor;

(B)  pay all business expenses of Safe Harbor, including all rent, utilities, insurance premiums, personnel costs and salaries, etc.;

(C)  undertake management and administrative responsibilities for all third-party payors (such as Medicaid and private insurers), including billing and payment collection;

(D)  prepare and file all reports and filings required by federal, state, and local regulatory agencies and third-party payors; and

(E)  "tak[e] all such other necessary and reasonable actions necessary and proper for the efficient and orderly operation" of the facility.

10.    In exchange for undertaking all operational aspects of Safe Harbor, the MSA provides that Pinnacle is to receive 90% of the facility's revenue as its management fee, while the shareholders of Safe Harbor are to receive the remaining 10% of revenue.

11.    The MSA is to have an initial period of five years from its June 9, 2022 Effective Date, and is to "auto renew" for an additional five year period unless Pinnacle gave notice of an intent not to renew.

12.    The MSA provides that it is to be governed by the law of California, without regard to conflicts of law principles.

13.    The MSA includes limited termination rights.  Among those, either party is entitled to terminate the MSA for material breach by the other party, upon giving written notice specifying the perceived breach and providing a 30-day period in which to cure it.  Non-curable breaches, on the other hand, permit immediate termination.

14.    The lengthy MSA includes several other provisions relevant to this dispute.  Most significantly, while Pinnacle disclaimed any warranty or representation "that the services provided by manager will result in any particular amount or level of Safe Harbor services or income to Safe Harbor," it committed that it:

> will use reasonable efforts to provide its services hereunder with substantially the same degree of care as it employs in providing such services for its own operations or those of its Affiliates, and for the operations of other businesses to which [Pinnacle] provides services.

15.    Elsewhere, the MSA provides that Safe Harbor "shall be provided with access to all such records, including continuing full and unfettered access to Safe Harbor's QuickBooks file."  The same provision further provides that Safe Harbor "shall be entitled to examine and/or copy Safe Harbor's books and records, including billing records, at any time during reasonable business hours for the purpose of auditing and verifying such records."  The next section provides that "all necessary administrative books and records [ ] relating to the operations of Safe Harbor . . . shall at all times remain Safe Harbor's property."  In addition, Pinnacle was required to maintain "separate books of account, separate accounting records, and separate business and financial records . . . for the operations of Safe Harbor and Manager."

16.    Critically, the MSA gave Pinnacle power of attorney for Safe Harbor, and appointed Pinnacle as the "exclusive true and lawful agent and attorney-in-fact to carry out the intent of this Agreement, with respect to those matters set forth on

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

Schedule 4.4." Schedule 4.4, in turn, lists the matters as to which Pinnacle holds power of attorney and is to act as attorney-in-fact. Among those matters are "employment matters," "contracts for services reasonably necessary in connection with the operation of Safe Harbor," and "billing, collection, and revenue cycle management."

17. "Revenue cycle management" is a term used in the healthcare industry to describe the entire process of generating patient revenue, from the first point of patient contact at the intake process, through discharge of the patient and receipt of final payment related to the entity's care for that patient. In other words, Pinnacle agreed to serve as Safe Harbor's attorney-in-fact with respect to generating patient revenue at the Safe Harbor facility, and Pinnacle thereby assumed the fiduciary duties that are attendant to that responsibility under California law.

**Pinnacle's Management of Safe Harbor**

18. Pinnacle was initially effective in its management of Safe Harbor. After taking 3-4 months to stabilize operations, Pinnacle's management of Safe Harbor yielded significant growth throughout 2023. While over the first six months of Pinnacle's management total income averaged $447,000 per month, over the ensuing eighteen months (through May 2024), total monthly income more than doubled, to an average of over $930,000 per month.

19. Because private substance abuse treatment is voluntary to the patients, a treatment center's ability to effectively advertise its services is of paramount importance to the center's success. Safe Harbor has been in business for over 30 years, such that its website has "high domain authority," meaning that it ranks highly in search engine results. The combination of that high profile and the website's Legit Script certification is key to a successful digital marketing platform. These factors make Safe Harbor's website a particularly effective platform for Google Ads campaigns. Accordingly, Pinnacle was able to leverage Safe Harbor's

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

digital assets to significantly boost admissions and thereby shared revenue for both parties.

20. Seeing the effectiveness of Safe Harbor's advertising ability over the initial 18 months of operating the facility, Pinnacle then volitionally created a conflict of interest between itself and Safe Harbor.

21. In March or April 2024 a large treatment center in Los Angeles opened, doing business as Invigorate Behavioral Health ("Invigorate"). Invigorate is owned by Defendant Arise Treatment Homes LLC ("Arise"). Arise's 2024 Statement of Information filed with the California Secretary of State lists the LLC's "Manager or Member" as Mike Borkowski. Mr. Borkowski is also listed on the 2025 Annual Report that Pinnacle filed with the Florida Secretary of State as Pinnacle's "registered agent." Furthermore, in a text sent to one of Safe Harbor's owners on March 7, 2024 from Mr. Brad Hisle, the "CEO and Founder" of Pinnacle Health Group, Mr. Hisle reported "we launched new program," referencing Invigorate.

22. The first order of business in launching a new treatment center is to put a staff in place. Accordingly, in March 2024 Defendants lured two key Safe Harbor employees to quit Safe Harbor and start working at Invigorate, as the Program Director, and the Clinical Services Supervisor.

23. The second order of business for a newly opened treatment center is to fill the beds. Accordingly, Pinnacle immediately began diverting incoming patients (whose attention had been drawn in through the advertising prowess of the Safe Harbor platform) to fill the beds at the new Invigorate facility. That conduct is apparent from the monthly income at Safe Harbor falling off a cliff promptly after the Invigorate facility opened.

24. A treatment center's income typically lags its patient admissions by 1-3 months (particularly for insured patients) as the patient begins his or her stint in treatment, and then the insurer pays the facility for the services it provided. In May

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

of 2024, for example, Safe Harbor achieved over $1.17 million in revenue, a significant part of which would have been from patients admitted in February or March.  In the successive months, however, income plummeted, from $774,000 in June 2024, to $634,000 in July, to $430,000 in August.  Over the six months thereafter, Safe Harbor's total income averaged just $496,000 per month, with January and February 2025 declining to $325,000 and $347,000, respectively.  In other words, Safe Harbor's total revenue in the first two months of 2025 had declined to just over *one-third* of what it had been over the 18 months prior to Pinnacle opening its own nearby facility.

25.    Safe Harbor's precipitous drop in income was not caused by lack of advertising.  Over the twelve months prior to Invigorate opening, Pinnacle recorded to Safe Harbor's books an average of $198,000 per month on advertising.  Then, over the ten months after Invigorate opened, Safe Harbor's advertising spend leapt to an average of $350,000 per month.  Notably, all of this advertising spend was loaded only onto *Safe Harbor*'s books (due to the effectiveness of Safe Harbor as an advertising platform).  In other words, despite Pinnacle increasing advertising spend on the Safe Harbor platform by 76%, the income that thereby redounded to Safe Harbor's benefit (and the associated share to its owners) plummeted by *half*.

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

26.     At the same time as Pinnacle was nearly doubling the advertising spending it recorded as *Safe Harbor's* expenses, it was sabotaging Safe Harbor's advertising.  A key strategy in online advertising is to create "landing pages" that a person is led to by clicking on a Google Ad.  Also known as "lead capture pages," the purpose of landing pages is to convert visitors into sales or leads.  The landing pages that Pinnacle created (ostensibly advertising the Safe Harbor facility) include a "learn more" hyperlink in the lower left of the page, as exemplified here:



While the text describes the virtues of Safe Harbor, on this landing page and at least three others that Pinnacle launched on October 30, November 1, and November 4, 2024, the "learn more" link redirects the visitor to https://invigoratebh.com—the home page for the Invigorate facility.

27.     Pinnacle's conduct in diverting prospective patients from Safe Harbor to Invigorate was motivated by extreme economic incentives.  That is, under the

- 8 -

MSA's revenue sharing provision, Pinnacle was required to pay Safe Harbor not just 10% of the *profits* earned from each patient, but 10% of the total *revenue* generated from that patient's admission. This means that each patient that Pinnacle re-routed to Invigorate would be far more profitable than each patient it routed to Safe Harbor, with that entire 10% of revenue being added directly to Defendants' bottom line.

28.    Another strategy that Defendants took to sabotage Safe Harbor concerned the routing of patients based on the third-party payor who would pay for the patient's stay. Third-party payors reimburse treatment providers at different rates, with certain private insurance companies being willing to pay much more than other insurers, and far more than Medicaid. Another attractive category of patient for treatment centers are "private payors"—those whose entire cost of treatment is paid either by themselves or their family. On information and belief, a comparison of the patient profiles admitted to Invigorate versus Safe Harbor between April 2024 and the present will show that when making placement decisions as between Invigorate and Safe Harbor, Pinnacle cherry-picked the most profitable patients for its own facility, while routing less profitable patients to Safe Harbor.

29.    A strong indicator of Defendants cherry picking the most profitable patients for Invigorate is seen in both the sharp decline in resident count at the Safe Harbor facility over the months since Invigorate opened, and the daily revenue associated with each such patient. Prior to Invigorate opening, Safe Harbor realized an average revenue of approximately $2,200 per day. By the end of 2024, in contrast, the average daily revenue had declined to approximately $880 per day.

**Safe Harbor's Discovery of Pinnacle's Misconduct and the Aftermath**

30.    In December 2024, having noticed several months of sustained declines in Safe Harbor's income, one of Safe Harbor's owners began scrutinizing Pinnacle's monthly financial reports. The spike in advertising expense coupled

with the precipitous decline in income caused Safe Harbor's owners to suspect that Pinnacle was doing exactly what is laid out here.

31.    Nevertheless, Safe Harbor's owners did not immediately confront Pinnacle over the oddities, because at the time the parties were negotiating the potential for Pinnacle to acquire Safe Harbor outright.  In December 2024, the parties had tentatively agreed to a $4.3 million sale price, with Pinnacle stating that the acquisition would be dependent on its ability to obtain financing.  That prospective deal remained under consideration for two months, until Pinnacle notified Safe Harbor in early February 2025 that it was no longer interested in acquiring Safe Harbor.

32.    At that point, Safe Harbor's owners concluded that they needed to investigate the cause of the collapse of the facility's income, both for their own edification, and to have the data that would be necessary to explain to any other potential acquirer that Safe Harbor would in fact be a highly profitable concern but for Pinnacle's actions in diverting Safe Harbor's prospective patients, while loading Safe Harbor's books with expenses.   That is, while Safe Harbor showed an average net operating income of over $496,000 per month in the nine months between June 2023 and February 2024, after Defendants opened the Invigorate center, Safe Harbor's net operating income over the nine months between June 2024 and February 2025 collapsed to *negative* $176,000 per month, making a sale all but impossible.

33.    Pinnacle loaded Safe Harbor's books with Invigorate's expenses in other ways as well, despite having committed in the MSA to maintain "separate books of account" and "separate business and financial records" for Safe Harbor. For example, on March 10, 2025, Pinnacle used Safe Harbor's checking account to pay Dr. Christian Smal, Invigorate's medical director, $27,317.50, with the memo line "Arise Treatment Homes."  This was in addition to the $11,730.00 it paid to

Dr. Smal from Safe Harbor's checking account on the same day, with the memo line "Safe Harbor Treatment."

34. One investigative step that Safe Harbor took was to arrange for a third party to call the phone number listed on the Safe Harbor website, under the guise of expressing interest in securing residential treatment for a family member, on a private-pay basis. The Pinnacle staff member who answered that January 23, 2025 call advised the caller that Safe Harbor had only two beds available, such that it might be full when the patient was ready to proceed, but that Safe Harbor had a "partner program" with good availability that the patient could enroll with instead. That statement by the Pinnacle representative was false. At the time of the call the Safe Harbor facility had fifteen beds available.

35. On February 24, 2025 Safe Harbor's owners emailed Mike Borkowski, the Managing Member and Chief Financial Officer of Pinnacle (also the "manager or member" of Arise), advising that Safe Harbor had received an offer for an equity sale in Safe Harbor that would reflect a "$2M enterprise value." Pursuant to their right under the MSA to have access to Safe Harbor's book and records, on February 25 Safe Harbor's owners requested Pinnacle to provide certain records, including records reflecting Safe Harbor's employee roster, updated information regarding the advertising spend on Safe Harbor's books, and records reflecting the daily collection rate for Safe Harbor patients versus that of Invigorate patients whose leads had been generated through advertising efforts on the Safe Harbor platform.

36. Receiving no response, on March 5, 2025 Safe Harbor's owners again emailed Mr. Borkowski to check in on the status of their request. At the ensuing March 6, 2025 call between two of Safe Harbor's owners and Mr. Borkowski, Pinnacle refused to provide the requested records. Over the next two weeks, the principals for the parties exchanged further emails about Safe Harbor's requests, culminating in a March 25 email from Safe Harbor's owners summarizing that

"[w]e expect Pinnacle to comply with its contractual and fiduciary obligations and provide the requested records promptly."

37.     The next communication was an April 1 email from a lawyer in Greenberg Traurig's Miami office, attaching a letter putatively from Mr. Borkowski, with a re: line reading "Notice of Breach and Termination Notice." That letter declared that Pinnacle was terminating the MSA, based on Safe Harbor having supposedly breached the MSA's confidentiality provision by sharing the content of the MSA with a potential acquirer.  The letter declared the MSA terminated effective April 4 (three days hence), while demanding a written response from Safe Harbor "within seven (7) days of the date of this Letter."

38.     Safe Harbor had not breached the confidentiality provision (or any of its other obligations under the MSA) in any respect, let alone by sharing the MSA with a prospective purchaser.  And Pinnacle had no reasonable basis for alleging such a breach, given that it would make no logical sense for a prospective buyer to care about the terms of the MSA, so much as the financial records that Safe Harbor's owners had requested and been refused.

39.     Through its counsel at Sheppard Mullin, Safe Harbor responded to the termination letter the same day it was received, advising Pinnacle that Safe Harbor had not breached the MSA's confidentiality provisions in any way, let alone by sharing of the MSA with any potential buyer.  In that response, Safe Harbor further emphasized that "Pinnacle is not permitted to terminate the MSA or abandon its obligations thereunder," and requested that Pinnacle rescind its termination assertion, while warning that if Pinnacle does not do so, "it will have breached the MSA, and will be responsible for all damages that flow to Safe Harbor therefrom."

40.     The following day (April 2, 2025), Pinnacle's counsel responded, repeating the supposed basis for the breach Pinnacle claimed, and adding Safe Harbor's supposed "termination of the lease [*i.e.*, the lease between the facility's landlord and Safe Harbor] without consultation with my client."  Pinnacle's counsel

also revised the alleged claim of breach respecting the MSA, now alleging that Safe Harbor breached the MSA's prohibition against disclosing "Confidential Information" just by disclosing the *existence* of the MSA. But "Confidential Information" is a defined term in the Appendix A to the MSA, and it includes only "the terms and conditions of this Agreement," not the MSA's mere existence.

41. In all events, Pinnacle ceased performing its obligations under the MSA on April 4, 2025. Those obligations include payment of rent and utilities for the facility, payment of staff salaries, and all other operational aspects of the business.

42. By disavowing its contractual obligations on plainly pretextual bases, Pinnacle placed Safe Harbor in an impossible position. Pinnacle had stopped placing new patients in Safe Harbor shortly after Safe Harbor's owners made their inquiries into the facility's financial records, so at the time Pinnacle declared termination, the 32-bed facility was down to just three patients, the last of whom was poised to discharge on April 7.

43. Upon Pinnacle's pretextual three-day notice of termination and abandonment of the facility, Safe Harbor's owners faced monthly expenses of at least $125,000 for rent and staff salaries alone. And given that Pinnacle had stopped routing any patients at all to Safe Harbor since the time that Safe Harbor's owners began inquiring as to the causes of the collapse of the facility's finances, Safe Harbor's owners were financially and pragmatically unable to continue operating the business, but are attempting to salvage what they can.

44. Even after Defendants had (1) re-routed an untold number of patient leads from Safe Harbor to themselves, (2) saddled Safe Harbor's books with expenses that benefitted only themselves, (3) left Safe Harbor in an impossible financial predicament through a pretextual termination, Defendants were still not done harming Safe Harbor, or enriching themselves. Defendants stopped admitting patients to Safe Harbor altogether on March 15, 2025, just nine days after the

March 6, 2025 call between two of Safe Harbor's owners and Mr. Borkowski, during which Safe Harbor's owners had re-asserted their demand to inspect financial records.  Despite having stopped routing patients to Safe Harbor, Defendants nevertheless continued their Google advertising on the Safe Harbor platform, to the tune of $30,422.60 over just the next week.  Plainly, any leads that were generated during that week were routed to Invigorate.

45.    Still not done, Pinnacle refused to honor its post-termination obligations under the MSA.  Section 7.5.4 of the agreement provides that "[u]pon termination of this Agreement, . . . Manager shall provide reasonable assistance to SAFE HARBOR with respect to the transition of the services provided by Manager hereunder to SAFE HARBOR."  Throughout the month of April (following the April 4 "termination"), Safe Harbor's owners repeatedly contacted Mr. Hisle and Mr. Borkowski regarding the transition of necessary services including (A) the domain name safeharbortreatmentcenter.org (including address associated with that email domain), (B) the American Express card in Safe Harbor's name in the possession of Mr. Hisle, (C) the Square account set up to process payments to Safe Harbor, (D) the bill.com account for managing accounts payable, and (E) the Venmo business account that Pinnacle had opened under Safe Harbor's name.  Despite repeated requests, Mr. Hisle and Mr. Borkowski refused to assist with the transition of those services.  Safe Harbor's owners attempted to contact the services themselves to effect the transition, but each one responded that because the service had been opened by one or another Pinnacle employee, that individual was required to give his/her permission before transferring responsibility for the account to Safe Harbor.

46.    Evidencing its bad faith, Pinnacle sought to condition its performance of its post-termination-notice obligations under the MSA upon Safe Harbor signing a release of all of its claims against Pinnacle.  For instance, On April 7, 2025 one of Safe Harbor's owners emailed Mr. Borkowski and Mr. Hisle to inform them that

Safe Harbor would need to "pause operations" as a result of Pinnacle's termination. The owner requested that in conjunction with that wind-down of operations, Pinnacle agree to transfer the remaining patients to Invigorate, use its HR staff to terminate the remaining employees, and ensure that funds were available to "cover payroll thru today and all your other accrued expenses."   Mr. Borkowski replied that same day, asserting that "[d]ue to the time involved and potential liability associated with the above, we would require a full release from Safe Harbor, its owners, affiliates, etc., before proceeding." He attached a draft release that would have required Safe Harbor to agree to release "all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, which have arisen."

### Post-Termination Events

47.    After this lawsuit was filed, Safe Harbor has received independent information confirming its allegations herein.  On June 24, 2025, one of Safe Harbor's owners was contacted by a social worker at St. Francis Medical Center, calling on behalf of (and in the company of) a 21 year-old man, John Doe.[1]  Mr. Doe related that "Safe Harbor" had flown him to California from his home state for residential treatment, and that having completed treatment, he was now seeking assistance from Safe Harbor for his return travel home.  But Safe Harbor's records confirm that Mr. Doe had never been a patient at Safe Harbor.  Rather, he had apparently contacted what he believed to be Safe Harbor through its website, and had then been routed to Invigorate for treatment (and payment, via his Cigna insurance policy).  After spending time at Invigorate and then a third facility called New Origins, Mr. Doe inquired of the staff at Invigorate about coordinating his

---

[1] Safe Harbor knows the individual's name, but herein uses a pseudonym to protect his medical privacy.

return travel.  He was told that Safe Harbor was responsible for his travel, and that he should therefore contact Safe Harbor to facilitate his return.

48.    Also following termination, Safe Harbor learned that Pinnacle had left unpaid a large number of invoices that had accrued during the time when Pinnacle managed the facility.  Among those was an outstanding invoice from Google for its advertising services in the amount of $91,879.05.  Pinnacle also left unpaid the payroll for Safe Harbor employees' final pay period.  Under section 3.1.2 of the MSA, all such bills for services were the responsibility of Pinnacle.  That Pinnacle owes these amounts to Safe Harbor is not disputed.  Pinnacle's CFO Mr. Borkowski authored an Excel spreadsheet that he sent to Safe Harbor's owners on April 8, 2025, recognizing as "Total Amounts Due to Safe Harbor" $120,142 for "Outstanding Payables" and $38,666.71 due to Safe Harbor for "payroll" "for period 3/22 – 4/4."  Among the listed "Outstanding Payables" on a second worksheet of that Excel document was the $91,879.05 Google bill.  In breach of its obligations under the MSA, Pinnacle has failed to pay any of these amounts to Safe Harbor.

49.    Mr. Borkowski's same spreadsheet recognized that Pinnacle owes Safe Harbor $34,627.63 as "Safe Harbor Revenue Share (3/1 – 4/6)."  In breach of its obligations under the MSA, Pinnacle has failed to pay Safe Harbor that amount as well.

50.    Section 7.5.3 of the MSA sets forth a process to compare the amounts of Accounts Receivable that were collected over the first six months of the term of the MSA (the "Starting A/R") with the amounts that were collected over the six months following the termination of the MSA (the "Ending A/R").  It provides that if the Starting A/R exceeds the Ending A/R, then Pinnacle is to pay the difference to Safe Harbor, and that conversely if the Ending A/R exceeds the Starting A/R, Safe Harbor is to pay the difference to Pinnacle.  This term was included in the MSA to account for the parties' recognition that most of the incoming payments

over the first six months would have been made for treatment that Safe Harbor had provided to its clients before Pinnacle appeared on the scene, while most of the A/R collected over six months following termination would have been made for treatment provided to Safe Harbor clients during the period when Pinnacle managed the facility.  Accordingly, if Safe Harbor's efforts in the period prior to the MSA generated more collectables than Pinnacle's efforts at the end of the MSA, then Safe Harbor would retain the difference, and vice versa.

51.    Section 7.5.3 provides that the comparison between the Starting A/R and the Ending A/R is to be performed "no later than one hundred ninety-five (195) days following the expiration or termination of this Agreement," and describes that date as the "Determination Date."  Given Pinnacle's asserted termination date of April 4, the Determination Date was October 16, 2025.  Accordingly, on October 14, Safe Harbor sent Pinnacle a letter setting forth the comparison of Starting A/R and Ending A/R.  The letter noted that on December 13, 2022, Pinnacle itself had calculated the Starting A/R as $622,423.44.  And as Safe Harbor showed via an Excel spreadsheet documenting all its A/R collections over the six months following termination, the Ending A/R was $441,846.80.  As the letter further stated, under section 7.5.3, Pinnacle owed Safe Harbor the amount by which the Starting A/R exceeded the Ending A/R, or $180,576.64.

52.    Section 7.5.3 further provides that payment under the A/R reconciliation process was to be made "within ten (10) days following the Determination Date," or October 26, 2025.  Through the date of this filing, Pinnacle has failed to pay this amount to Safe Harbor.  Pinnacle has also refused to comply with the contractually agreed process for comparing Starting A/R and Ending A/R by insisting that Safe Harbor provide documentary backup that is not relevant to the A/R determination.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract – Against Pinnacle)**

53.     Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

54.     Safe Harbor and Pinnacle were parties to the MSA, with an effective date of June 9, 2022.

55.     Safe Harbor performed all of the obligations that were required of it under the MSA.

56.     Pinnacle breached the MSA by failing to "use reasonable efforts to provide its services hereunder with substantially the same degree of care as it employs in providing such services for its own operations."  That is, the degree of care and reasonable effort that Pinnacle would exercise were it providing the MSA's services to its own Invigorate treatment center would not entail it re-routing incoming patients to facilities owned by other entities, or creating Google Ads landing pages that advertised Invigorate, but in reality directed interested customers to a competing treatment center.  Nor would that degree of care entail Pinnacle placing only the lowest-paying patients in its own facility, while sending the highest-paying patients to facilities owned by other parties.

57.     Pinnacle further breached the MSA by ceasing the performance of its obligations thereunder effective April 4, 2025.  All of the putative bases for Pinnacle's supposed right to terminate the MSA were pretextual—they were based on supposed actions by Safe Harbor that either did not occur at all, or were not breaches of the MSA, let alone "material" breaches that would permit Pinnacle to terminate the MSA.

58.     Pinnacle further breached the MSA by failing to provide reasonable post-termination assistance to Safe Harbor with respect to the transition of the services that Pinnacle had been providing for Safe Harbor under the MSA.

59.     Pinnacle further breached the MSA by failing to pay the outstanding invoices and payroll as of the termination date, and by failing to pay Safe Harbor its revenue share for March 2025, all of which is acknowledged in the Excel

spreadsheet Mr. Borkowski sent to Safe Harbor on April 8, 2025.  Numerous additional unpaid invoices were, however, omitted from Mr. Borkowski's list.

60.  Pinnacle further breached the MSA by failing to pay Safe Harbor the amount by which the Starting A/R exceeded the Ending A/R, as provided in section 7.5.3 of the MSA, and by not following the agreed process for comparing the two A/R periods.

61.  Pinnacle's breaches of the MSA were the sole cause of harm to Safe Harbor in multiple ways.  First, Pinnacle's re-routing of patients directly reduced the 10% share of total income that was due to Safe Harbor under the MSA's revenue sharing provision.

62.  Second, by re-routing patients to reduce Safe Harbor's revenue, while loading its books with expenses, Pinnacle made Safe Harbor essentially unsaleable.  Like many other small businesses, treatment centers are typically valued based on a multiple of their EBITDA, yielding a "going concern value."  Had Pinnacle maintained its management of Safe Harbor "with substantially the same degree of care as it employs in providing such services for its own operations," Safe Harbor would have enjoyed an EBITDA of approximately $5 million.  At an exemplary valuation of five times EBITDA, Safe Harbor would have had a going concern value of approximately $25 million.  But through the breaches described above, since the time that Pinnacle opened its own Invigorate treatment center, Safe Harbor's EBITDA declined to an annualized $0.00, giving it a going concern value of $0.00.

63.  At a bare minimum, the going-concern value of Safe Harbor—even after Pinnacle had been breaching the MSA for eight months—was the $4.3 million purchase price that Pinnacle itself had contemplated in December 2024 (even after Pinnacle had drastically reduced Safe Harbor's patient count by re-routing patients to Invigorate).  Pinnacle's breaches of the MSA reduced that value to $0.00.

64.     Pinnacle's breach of the MSA via its pretextual "termination" further harmed Safe Harbor by causing Safe Harbor and its owners to incur all of the expenses of the business from the April 4, 2025 termination date onward.  All such expenses were the responsibility of Pinnacle under the plain terms of the MSA.

## SECOND CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against Pinnacle)**

65.     Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

66.     Under California law, in every contract there is an implied promise of good faith and fair dealing, which prohibits either party from doing anything that will unfairly interfere with the right of the other party to receive the benefits of the contract.  The covenant further requires both parties to perform their obligations with honesty of purpose, and without any intention to take unfair advantage of the other.

67.     In entering the MSA, Pinnacle committed to "use reasonable efforts to provide its services hereunder with substantially the same degree of care as it employs in providing such services for its own operations."  Implicit in that obligation was a duty for Pinnacle not to exploit Safe Harbor's advertising reach to divert prospective patients from Safe Harbor to its own Invigorate treatment facility, both through the intake process and through hyperlinking visitors to Safe Harbor's landing pages to Pinnacle's own website.  Pinnacle further breached this obligation by loading up Safe Harbor's books with expenses that were properly attributable to Pinnacle's own operations, making Safe Harbor appear grossly unprofitable, thereby making it virtually impossible for Safe Harbor's owners to sell the business to any potential buyer.

68.     Pinnacle's bad faith and unfair dealing is further evidenced by its efforts to stonewall the inquiries that Safe Harbor's owners attempted to make into

Pinnacle's management activities in early 2025, by refusing to allow Safe Harbor's owners complete access to Safe Harbor's business records.

69.    Pinnacle's bad faith and unfair dealing is further evidenced by its termination of the MSA on completely pretextual bases, and/or on bases that do not constitute a breach of the MSA at all, let alone a "material" breach, as the termination provision requires.

70.    Finally, Pinnacle's bad faith and unfair dealing is evidenced by its repeated insistence that it would only perform its obligations under section 7.5.4. of the MSA (to provide reasonable assistance to Safe Harbor with respect to the transition of services post termination) on Safe Harbor's agreement to release all of its accrued claims against Pinnacle.

71.    Pinnacle's bad faith and unfair dealing in the course of performing under the MSA caused harm to Safe Harbor in multiple ways.  First, Pinnacle's re-routing of patients directly reduced the 10% share of total income that was due to Safe Harbor under the MSA's revenue sharing provision.

72.    Second, by reducing Safe Harbor's revenue while loading its books with expenses, Pinnacle made Safe Harbor essentially unsaleable.  Like many other small businesses, treatment centers are typically valued based on a multiple of their EBITDA, yielding a "going concern value."  Had Pinnacle maintained its management of Safe Harbor in the same manner as it had prior to opening its own Invigorate treatment center, Safe Harbor would have enjoyed an EBITDA of approximately $5 million.  At an exemplary valuation of five times EBITDA, Safe Harbor would have had a going concern value of approximately $25 million.  But through the breaches described above, since the time that Pinnacle opened its own Invigorate treatment center, Safe Harbor's EBITDA declined to an annualized $0.00, giving it a going concern value of $0.00.

73.    At a bare minimum, the going-concern value of Safe Harbor—even after Pinnacle's bad-faith conduct had been underway for eight months—was the

$4.3 million purchase price that Pinnacle itself had contemplated in December 2024 (even after Pinnacle had drastically reduced Safe Harbor's patient count by re-routing patients to Invigorate).  Pinnacle's execution of its plan to elevate its own interests over those of Safe Harbor reduced that value to $0.00.

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – Against Pinnacle)

74.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

75.    Having received power of attorney and undertaken the role of attorney-in-fact for Safe Harbor with respect to, *inter alia*, revenue cycle management, Pinnacle assumed a fiduciary duty of undivided loyalty to act with the utmost good faith in the best interests of Safe Harbor.

76.    Pinnacle breached its fiduciary duty of loyalty to Safe Harbor in the same ways as it breached the implied covenant of good faith and fair dealing.  In other words, Pinnacle knowingly acted against Safe Harbor's interests both by using Safe Harbor's advertising prowess to re-route potential Safe Harbor patients from Safe Harbor to Pinnacle's own facility, and by loading up Safe Harbor's books with expenses at the same time as it was reducing Safe Harbor's income. Safe Harbor did not consent to either course of dealing by Pinnacle.

77.    Pinnacle further breached the fiduciary duty it owed to Safe Harbor by purporting to "terminate" the MSA on completely pretextual bases, saddling Safe Harbor with all of the operational expenses that were Pinnacle's obligation to pay.

78.    Pinnacle's breach of its fiduciary duty harmed Safe Harbor by reducing the 10% revenue sharing Safe Harbor was entitled to, by reducing Safe Harbor's going concern value to $0.00, and by forcing Safe Harbor to pay for all operational expenses from April 4, 2025 forward, as alleged in the preceding paragraphs.  Pinnacle's actions were the sole cause of that harm.

79.    Safe Harbor is entitled to punitive damages for Pinnacle's violations of its fiduciary duty, because Pinnacle's betrayal of its voluntarily assumed duty to Safe Harbor constitutes intentional and despicable conduct that Pinnacle carried out with a willful and conscious disregard for the rights of Safe Harbor, its principal.

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty – Against Arise)

80.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

81.    Arise aided and abetted Pinnacle's breach of its fiduciary duty by working in collaboration with Pinnacle to engage in the conduct alleged in the preceding four paragraphs.

82.    Arise knew that Pinnacle owed a fiduciary duty to Safe Harbor, and knew that Pinnacle was engaged in breaching that duty by, if nothing else, virtue of the fact that Mr. Borkowski is a member of both Defendant LLCs, and acted on behalf of both of them in orchestrating that conduct.

83.    Arise provided substantial assistance and encouragement to Pinnacle's breaches of its fiduciary duty by providing the beds for the re-routed patients to occupy at the Invigorate facility, by facilitating the intake of those re-routed patients, and by receiving payment for the treatment of those patients.

84.    Arise's conduct in doing those things was a substantial factor in causing the harm to Plaintiff alleged herein.  That is, had Arise not provided the beds and arranged for the intake of the re-routed patients, those patients who inquired about treatment at Safe Harbor and/or responded to Safe Harbor's online advertising would have had nowhere to go *but* Safe Harbor.

85.    Because Arise and Pinnacle acted in concert, Arise is jointly and severally liable with Pinnacle for both compensatory and punitive damages.

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

## FIFTH CLAIM FOR RELIEF
### (Intentional Interference with Prospective Economic Relations – Against Pinnacle)

86.     Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

87.     Through the conduct described herein, Pinnacle intentionally interfered with the economic relationship between Safe Harbor and each prospective patient that Pinnacle rerouted to the Invigorate facility.  At the moment those patients clicked on a falsely labeled Safe Harbor landing page and were rerouted to Invigorate's website, and/or called Safe Harbor's intake phone number, those patients were in a prospective economic relationship with Safe Harbor that would have resulted in a benefit to Safe Harbor if the patient had been enrolled at Safe Harbor.

88.     At the moment Pinnacle received that inquiry from a prospective patient, it knew of the prospective economic relationship between that patient and Safe Harbor, but engaged in the re-routing conduct described herein, thereby knowing that such conduct was certain or substantially certain to disrupt the relationship between that patient and Safe Harbor.

89.     Safe Harbor's prospective economic relationship with such patients was in fact disrupted when the patient enrolled at Invigorate rather than Safe Harbor.

90.     Safe Harbor was harmed by Pinnacle's interference in the ways alleged herein—by losing the associated revenue share it would have realized had the patient enrolled at Safe Harbor, and by Pinnacle's interference reducing the going concern value of Safe Harbor as a business, down to the $0.00 value it currently has.  Pinnacle's conduct was a substantial cause of those harms.

91.     Safe Harbor is entitled to punitive damages for Pinnacle's intentional interference, because Pinnacle's conduct constitutes intentional and despicable

conduct that Pinnacle carried out with a willful and conscious disregard for the rights of Safe Harbor, its principal.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Intentional Interference with Prospective Economic Relations – Against Arise)

92.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

93.    Arise aided and abetted Pinnacle's intentional interference with the prospective economic relations between Safe Harbor and its prospective clients by working in collaboration with Pinnacle to engage in the conduct alleged in the preceding six paragraphs.

94.    Arise knew that Pinnacle was intentionally interfering with the prospective economic relations between Safe Harbor and its clients by, if nothing else, virtue of the fact that Mr. Borkowski is a member of both Defendant LLCs, and acted on behalf of both of them in orchestrating that conduct.

95.    Arise provided substantial assistance and encouragement to Pinnacle's intentional interference with the prospective economic relations between Safe Harbor and its prospective clients, by providing the beds for the re-routed patients to occupy at the Invigorate facility, by facilitating the intake of those re-routed patients, and by receiving payment for the treatment of those patients.

96.    Arise's conduct in doing those things was a substantial factor in causing the harm to Plaintiff alleged herein.  That is, had Arise not provided the beds and arranged for the intake of the re-routed patients, those patients who inquired about treatment at Safe Harbor and/or responded to Safe Harbor's online advertising would have had nowhere to go *but* Safe Harbor.

97.    Because Arise and Pinnacle acted in concert in engaging in this conduct, Arise is jointly and severally liable with Pinnacle for both compensatory and punitive damages.

## SEVENTH CLAIM FOR RELIEF
### (Lanham Act False Advertising (15 U.S.C. § 1125(a)(1)(B)) – Against Pinnacle)

98.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

99.    Section 43(a)(1)(B) of the Lanham Act imposes civil liability on any person who "in connection with any goods or services . . . uses in commerce any word, term, name, [etc.] . . . which," "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities," commonly referred to as false advertising.

100.   Pinnacle engaged in false advertising in violation of section 43(a)(1)(B) by, as described in paragraph 26 above, creating a series of "landing pages" in conjunction with its Google Advertising campaigns that on their face described the nature, characteristics, and qualities of treatment provided by Safe Harbor, and prominently using the tradename "Safe Harbor."  However, Pinnacle placed a "learn more" hyperlink at the bottom of the landing pages that, when clicked, brought the viewer to https://invigoratebh.com/—the homepage for Defendants' competing Invigorate facility.

101.   The landing pages at issue were created by Pinnacle or at its direction on various dates between October 30, 2024 and November 12, 2024, and were available online at least through April 3, 2025.  The "learn more" link was false, because rather than learning more about Safe Harbor when clicking the link, the viewer would learn more about Invigorate.  It was therefore a false description of Safe Harbor's product.

102.   That misleading hyperlink deceived and had the tendency to deceive every individual who clicked on it, either because the person would not have noticed that they had been re-routed to a different treatment center, or would have believed that Safe Harbor and Invigorate were two names for the same facility, or

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

were otherwise affiliates.  And the deception was material, in that it was highly likely to influence such prospective patients to contact Invigorate for treatment, rather than contacting Safe Harbor.  In other words, when a person landed at Invigorate's website and decided to pursue treatment, they would have called the Invigorate phone number prominently listed on the website, or clicked the "Contact Us" button prominently listed, and thereafter paid Invigorate for its treatment services had they enrolled.  Had the link not been false and deceptive, in contrast, the person would have landed at https://safeharbortreatmentcenter.com/, and if they decided to pursue treatment would have clicked either the "Call Us Now" or "Contact Us" button, and thereafter paid Safe Harbor for the treatment services that *it* provided.  Indeed, the likelihood for deception was highly pronounced given the particular audience.  People seeking substance abuse treatment are almost invariably at their wit's end by the time they seek help.  Many would not have even noticed that they had been misled into contacting Invigorate instead of Safe Harbor, and if they had noticed the switch, would have inferred that Invigorate and Safe Harbor were either the same treatment center, or were affiliated with each other, which itself would be false.

103.   At a minimum, Pinnacle's deceptive behavior regarding the landing pages and the "learn more" link violated section 43(a)(1)(B) under the "initial interest confusion" doctrine, which provides that even if the consumer's confusion is dispelled prior to engaging in a financial transaction (for example, if Invigorate's intake staff clarified that Invigorate and Safe Harbor have no affiliation), Pinnacle can still be liable for having induced the transaction through using the "learn more" link to divert the patient's attention from Safe Harbor to Invigorate.

104.   Pinnacle caused these deceptive statements to enter interstate commerce by displaying them to a national or worldwide audience on the internet.  And these deceptive statements actually affected interstate commerce, given that a

distinct majority of patients who come to Safe Harbor come from outside California.

105. Safe Harbor was harmed by Pinnacle's conduct in the ways alleged herein. That is, had Pinnacle not deceptively directed these viewers to Invigorate and had they enrolled at Safe Harbor instead, Safe Harbor and its owners would have received 10% of the revenue associated with those individuals' treatment. The false advertising further caused harm to Safe Harbor by reducing its headcount and revenue, both of which contributed to the elimination of Safe Harbor's value as a going concern.

106. Safe Harbor expects that discovery will show that Pinnacle's false advertising was willfully and maliciously designed to harm Safe Harbor and to benefit Pinnacle. Accordingly, this will be an exceptional case, for which an award of both attorneys' fees and treble damages is appropriate.

## EIGHTH CLAIM FOR RELIEF
**(Lanham Act False Designation of Origin / Unfair Competition (15 U.S.C. § 1125(a)(1)(A)) – Against Pinnacle)**

107. Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

108. Section 43(a)(1)(A) of the Lanham Act imposes civil liability on any person who "in connection with any goods or services . . . uses in commerce any word, term, name, [etc.] . . . which," "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," commonly referred to as false designation of origin or unfair competition.

109. Pinnacle engaged in false designation of origin and unfair competition in violation of section 43(a)(1)(A) by, as described in paragraph 26 above, creating a series of "landing pages" in conjunction with its Google Advertising campaigns that on their face described the treatment provided by Safe Harbor, and prominently

using the tradename "Safe Harbor."  However, Pinnacle placed a "learn more" hyperlink at the bottom of the landing pages that, when clicked, brought the viewer to https://invigoratebh.com/—the homepage for Defendants' competing Invigorate facility.

110.    The landing pages at issue were created by Pinnacle or at its direction on various dates between October 30, 2024 and November 12, 2024, and were available online at least through April 3, 2025.  The "learn more" link was likely to cause confusion, mistake, or deception as to whether Safe Harbor was affiliated or connected with Invigorate, because rather than learning more about Safe Harbor when clicking the link, the viewer would learn more about Invigorate.  The misleading link would further cause all reasonable viewers who noticed the name-swap to believe that Invigorate had the sponsorship or approval of Safe Harbor, or that Invigorate originated from Safe Harbor.

111.    That misleading hyperlink deceived and had the tendency to deceive every individual who clicked on it, either because the person would not have noticed that they had been re-routed to a different treatment center, or would have believed that Safe Harbor and Invigorate were two names for the same facility, or were otherwise affiliates.  And the deception was material, in that it was highly likely to influence such prospective patients to contact Invigorate for treatment, rather than contacting Safe Harbor.  In other words, when a person landed at Invigorate's website and decided to pursue treatment, they would have called the Invigorate phone number prominently listed on the website, or clicked the "Contact Us" button prominently listed, and thereafter paid Invigorate for its treatment services had they enrolled.  Had the link not been false and deceptive, in contrast, the person would have landed at https://safeharbortreatmentcenter.com/, and if they decided to pursue treatment would have clicked either the "Call Us Now" or "Contact Us" button, and thereafter paid Safe Harbor for the treatment services that *it* provided.  Indeed, the likelihood for confusion, mistake, or deception was highly

pronounced given the particular audience. People seeking substance abuse treatment are almost invariably at their wit's end by the time they seek help. Where those who clicked on the deceptive link noticed the name switch, they would have inferred that Invigorate and Safe Harbor were either the same treatment center, or were affiliated with each other.

112. At a minimum, Pinnacle's deceptive behavior regarding the landing pages and the "learn more" link violated section 43(a)(1)(A) under the "initial interest confusion" doctrine, which provides that even if the consumer's confusion is dispelled prior to engaging in a financial transaction (for example, if Invigorate's intake staff clarified that Invigorate and Safe Harbor have no affiliation), Pinnacle can still be liable for having induced the transaction through using the "learn more" link to divert the patient's attention from Safe Harbor to Invigorate.

113. Pinnacle caused these deceptive and confusing statements to enter interstate commerce by displaying them to a national or worldwide audience on the internet. And these deceptive statements actually affected interstate commerce, given that a distinct majority of patients who come to Safe Harbor come from outside California.

114. Safe Harbor was harmed by Pinnacle's conduct in the ways alleged herein. That is, had Pinnacle not deceptively directed these viewers to Invigorate and had they enrolled at Safe Harbor instead, Safe Harbor and its owners would have received 10% of the revenue associated with those individuals' treatment. The false advertising further caused harm to Safe Harbor by reducing its headcount and revenue, both of which contributed to the elimination of Safe Harbor's value as a going concern.

115. Safe Harbor expects that discovery will show that Pinnacle's false advertising was willfully and maliciously designed to harm Safe Harbor and to benefit Pinnacle. Accordingly, this will be an exceptional case, for which an award of both attorneys' fees and treble damages is appropriate.

## NINTH CLAIM FOR RELIEF
### (Unfair Competition Law – Against Both Defendants)

116.   Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

117.   Defendants undertook unfair and fraudulent business acts and practices to divert individuals who were seeking substance abuse treatment from Safe Harbor to Defendants' own facility, Invigorate.  Those unfair and fraudulent acts and practices included the scheme as described herein in all its forms:  redirecting prospective patients via the deceptive landing pages Pinnacle created for Safe Harbor's advertising, false statements that Pinnacle's staff made to callers as to the availability of beds at Safe Harbor, diverting the highest paying clients to Defendants' own facility, loading Safe Harbor's books with expenses that were intended to benefit Invigorate while simultaneously reducing the apparent economic viability of Safe Harbor, declaring the termination of the MSA on obviously pretextual grounds, and refusing Safe Harbor's owners the records inspection rights to which they were contractually entitled.

118.   Defendants' unfair and fraudulent acts and practices caused Safe Harbor to suffer economic injury, by loss of the associated revenue share it would have realized had Pinnacle not engaged in that conduct, by causing Safe Harbor to bear all operational expenses from April 4, 2025 forward, and by Defendants' acts and practices eliminating the going concern value of Safe Harbor as a business.

119.   Plaintiff is entitled to restitution and disgorgement of the money that Defendants acquired by means of such unfair acts and practices.

## TENTH CLAIM FOR RELIEF
### (Indemnification – Against Pinnacle)

120.   Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

121.   Under Section 9.2.2 of the MSA Pinnacle agreed to indemnify Safe Harbor against "any and all . . . damages and expenses of any kind, including

reasonable attorneys' fees ('Losses')" arising from any "breach, by either act or omission, by Manager of any . . . covenants, obligations or agreements of Manager contained in this Agreement," and against any such Losses arising from "willful misconduct or gross negligence by Manager."

122. Safe Harbor and Pinnacle were parties to the MSA, with an effective date of June 9, 2022.

123. Safe Harbor performed all of the obligations that were required of it under the MSA.

124. Pinnacle breached the MSA in numerous ways, and engaged in numerous non-contractual forms of willful misconduct, as described herein.

125. Safe Harbor has been damaged by Pinnacle's breaches and misconduct as described herein, in an amount to be proven at trial. To prove those losses and obtain its just remedy, Safe Harbor will incur hundreds of thousands of dollars in attorneys' fees, in an amount to be proven in post-trial proceedings.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment as follows:

1. For judgment against Defendants Pinnacle Health Group LLC and Arise Treatment Homes LLC;

2. For compensatory damages;

3. For punitive/exemplary damages;

4. For treble damages;

5. For attorneys' fees;

6. For restitution and disgorgement;

7. For costs; and

8. For such other and further relief as the Court deems just and proper.

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

Dated:  January 20, 2026                    GAW | POE LLP


                                            By:    s/ *Mark Poe*
                                                   Mark Poe
                                                   Attorneys for Plaintiffs

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT

## JURY DEMAND

Plaintiff Safe Harbor Treatment Center for Women, Inc. hereby demands a jury trial of its claims against Defendants Pinnacle Health Group LLC and Arise Treatment Homes LLC.

Dated:  January 20, 2026                    GAW | POE LLP


By:    s/ *Mark Poe*
Mark Poe
Attorneys for Plaintiffs

8:25-CV-00703-KES
SECOND AMENDED COMPLAINT