# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. 8:25-cv-00703-KES                                      Date:  April 7, 2026

Title: SAFE HARBOR TREATMENT CENTER FOR WOMEN, INC. v.
    PINNACLE HEALTH GROUP LLC, et al.

PRESENT:

#### THE HONORABLE KAREN E. SCOTT, U.S. MAGISTRATE JUDGE

| Jazmin Dorado | Not Present |
|:---:|:---:|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|:---:|:---:|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**    **Order GRANTING Motion to Dismiss Counterclaims (Dkt. 59)**

In April 2025, Plaintiff Safe Harbor Treatment Center for Women, Inc. ("Safe Harbor") filed this action against Defendants Pinnacle Health Group LLC ("Pinnacle") and Arise Treatment Homes LLC ("Arise") (collectively, "Defendants"). In October 2025, Defendants timely answered and asserted counterclaims against Safe Harbor.  (Dkt. 27.)  With leave of Court, Defendants filed an amended Answer and Counterclaim in November 2025.  (Dkt. 37.)

In December 2025, Safe Harbor moved to dismiss six of Defendants' counterclaims.  (Dkt. 42.)  The Court conducted a hearing on January 6, 2026. (Dkt. 52.)  The Court granted the motion to dismiss, in part, but with leave to amend.  (Dkt. 53.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-00703-KES                                    Date: April 7, 2026
                                                                          Page 2

In February 2026, Defendants filed their Second Amended Counterclaim ("SAC").  (Dkt. 58.)  Safe Harbor again moved to dismiss.  (Dkt. 59.)  After Defendants filed an opposition (Dkt. 60) and Safe Harbor replied (Dkt. 61), the Court took the motion under submission without a hearing (Dkt. 62).

For the reasons stated below, the Court GRANTS the motion to dismiss (Dkt. 59) with leave to amend both breach of contract claims but without further leave to amend the breach of fiduciary duty claim.

## I.  THE MOTION TO DISMISS.

Safe Harbor moves to dismiss counterclaims for (1) breach of contract, (2) breach of the implied covenant of good faith, and (3) breach of fiduciary duty.

### A.  Breach of Contract.

Safe Harbor owns a substance abuse treatment center business operating at six locations leased from three landlords (the "Facility").  (Dkt. 58 ¶¶ 5, 7.)  In June 2022, Pinnacle entered into a Management Services Agreement ("MSA") with Safe Harbor to manage and operate the Facility.  (Id. ¶ 13.)  Defendants attached a copy of the MSA to the SAC.  (See Dkt. 58-1.)

Defendants allege that Safe Harbor breached the MSA in the following five ways, each of which is challenged by the Motion to Dismiss:

#### 1.  Failing to Disburse Reserve Account Funds.

MSA § 4.5.3 provides for the creation of a Reserve Account, as follows:

Upon the execution of this Agreement, … Manager shall deposit in the SAFE HARBOR BofA Account designated as the savings account (the "Reserve Account") the sum of Two Hundred Fifty Thousand Dollars ($250,000) (the "Operating Loan").  Such amount shall be deemed to be a non-recourse loan from Manager to SAFE HARBOR and shall be repaid to Manager as described in Section 6.1. In the event such loan has not been fully repaid to Manager by SAFE HARBOR upon the expiration or termination of this Agreement, the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-00703-KES                                      Date: April 7, 2026
                                                                             Page 3

remaining balance of such loan shall be forgiven.

(Dkt. 58-1 at 11.)

MSA § 6.1 defines Pinnacle's "management fee."  Subsection (a) establishes a baseline monthly fee, while subsection (b) lists four items (identified by Roman numerals (i)-(iv)) to be subtracted from the baseline amount.  One item to be subtracted is the "Reserve Amount," defined as follows:

> (ii) the amount of cash necessary to maintain a reserve balance as of the Payment Date in the Reserve Account of no less than One Hundred Fifty Thousand Dollars ($150,000) until the first anniversary of the Effective Date, and no less than Three Hundred Fifty Thousand Dollars ($350,000) thereafter (in either case, the "Reserve Amount")

(Dkt. 58-1 at 14.)  Another item to be subtracted is "(iii) the remaining principal balance of the Operating Loan, plus interest at the applicable federal rate."  (Id.) The "Operating Loan" is the initial $250,000 deposited into the Reserve Account. MSA § 4.5.3.

The definition of Pinnacle's "management fee" further provides:

> If at any time during the Term, the balance of the Reserve Account is less than the Reserve Amount, Manager shall immediately deposit in the Reserve Account such amount as is necessary to cause the balance of the Reserve Account to equal or exceed the Reserve Amount, and such amount shall be added to the balance of the Operating Loan.

(MSA § 6.1, Dkt. 58-1 at 14.)

Upon termination of the MSA, § 7.5.1 provides that "neither Party shall have any further obligations under this Agreement ***except for*** (a) obligations accruing prior to the date of expiration or termination, including, without limitation, payment of the SAFE HARBOR Distribution, ***payment of all Management Fees*** and other amounts payable to Manager [(i.e., Pinnacle)] hereunder and (b) obligations,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:25-cv-00703-KES                                     Date: April 7, 2026
                                                              Page 4

promises, or covenants set forth in this Agreement that are expressly made to extend beyond the Term, including, without limitation, those set forth in Section 7.5.3, Section 8.2 (Confidentiality), Section 9.2 (Liability; Indemnification) and all of Section 10 (Miscellaneous)."  (Dkt. 58-1 at 16, emphasis added.)

The SAC alleges that upon executing the MSA, "Pinnacle deposited into the Reserve Account the sum of $250,00" consistent with MSA § 4.5.3.  (SAC ¶ 71(A).)  While this initial $250,000 was a non-recourse loan, Pinnacles alleges that "Additional funds provided by Pinnacle into the Reserve Account are the property of Pinnacle" upon termination of the MSA.  (Id.)  Before terminating the MSA, Pinnacle put an additional $100,000 in the Reserve Account.  "On information and belief, Safe Harbor breached [MSA § 7.5.1] by filing to dis[b]urse the $100,000."  (Id.)

Again, Pinnacle has not alleged facts that, if accepted as true, show that Safe Harbor breached the MSA by failing to pay funds from the Reserve Account to Pinnacle as part of the "management fee."  Per the above cited provisions of the MSA, Pinnacles was obligated to put money into the Reserve Account to keep it at or above $350,000.  (MSA § 6.1.)  None of this $350,000 was part of the "management fee" owed to Pinnacle upon termination of the MSA.  (Id.)  By alleging that Safe Harbor breached MSA § 7.5.1 by failing to disburse the management fee, but then erroneously identifying the $100,000 as part of the management fee, Pinnacle has not alleged facts sufficient to state a claim.  The Court is not bound to accept legal conclusions couched as factual allegations, including conclusory allegations of breach inconsistent with the terms of the contract.  See Phlaum v. Navy Fed. Credit Union, No. EDCV 24-0765 JGB (DTBx), 2025 U.S. Dist. LEXIS 206413, at *9 (C.D. Cal. Oct. 10, 2025).

## 2.      Failing to "Maintain the Lease."

Regarding the Facility's leases, Defendants previously alleged, "Safe Harbor controlled the negotiations with the landlord to renew the lease, but those negotiations broke down over a dispute concerning responsibility for making and paying for the repairs the Facility required."  (Dkt. 37 at 30, ¶ 37.)  Eventually, the landlord "declined to renew the Facility's lease, which ended in August 2025," even after Pinnacle "offered to pay the landlord an additional $100,000 in exchange for renewing the lease."  (Dkt. 37 at 30-31, ¶¶ 39-40.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:25-cv-00703-KES                                      Date: April 7, 2026
                                                                      Page 5

The Court found that these allegations failed to state a claim for breach of the MSA, reasoning as follows:

> Defendants do not cite any provision in the MSA that required Safe Harbor to maintain the lease, no matter what.  Even if the MSA is interpreted to require that Safe Harbor use commercially reasonable efforts to maintain the lease, Pinnacle does not allege that Safe Harbor did anything unreasonable that caused the landlord to decide not to renew the lease.

(Dkt. 53 at 5-6.)

Now in the SAC, Defendants allege that Safe Harbor's failure to maintain the Facilities Lease breach specified terms of the MSA.  (SAC ¶ 71.)  Each alleged contract term is analyzed below.

### a.      MSA § 4.1

Under MSA § 4.1, Safe Harbor "agree[d] not to take any actions which will unreasonably interfere with or materially expand the duties or financial obligations of [Pinnacle] hereunder without the prior written approval of [Pinnacle]."  (Dkt. 58-1 at 9.)  Pinnacle alleges that Safe Harbor breached MSA § 4.1 by failing to maintain the Facility's leases.  (SAC ¶ 70(B).)

Pinnacle reasons that it contracted to manage Safe Harbor's operations at the Facility and receive a "management fee" for its services.  (MSA § 2.1.)  By failing to maintain the Facility's leases, Safe Harbor "unreasonably interfered" with Pinnacle's ability to earn its management fee, because Pinnacle could no longer manage Safe Harbor's operations at the Facility once the Facility's leases ended.

The general language of MSA § 4.1 does not impose on Safe Harbor a contractual duty to maintain the Facility's leases.  The MSA makes Safe Harbor responsible for paying lease expenses (MSA § 4.3) and limited Pinnacle's ability to be a party to the leases (MSA § 3.8.1).  There is no guaranty in the MSA that Safe Harbor will maintain the lease.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-00703-KES                              Date: April 7, 2026
                                                       Page 6

In any event, the SAC admits that Pinnacle terminated the MSA while the Facility's leases were still in effect.  (SAC ¶¶ 7, 44 (the leases were set to terminate in August 2023) and ¶ 59 (Pinnacle terminated the MSA in April 2025).)  Any later failure by Safe Harbor to maintain the leases could not have caused damage to Pinnacle.

>        b.      MSA §§ 2.1 and 2.2

Under MSA § 2.1, Safe Habor agreed to "cooperate" with Pinnacle and "perform any and all duties and obligations which must be performed by the party licensed to perform those obligations under applicable state and federal Laws, ordinances, rules and regulations."  (Dkt. 58-1 at 2.)  MSA § 2.2 has the same language.  (Id. at 3.)  Pinnacle alleges that Safe Harbor breached MSA §§ 2.1 and 2.2 by failing to maintain the Facility's leases.  (SAC ¶ 71(B) ("Safe Harbor's obligations under the MSA included maintaining the Designated Facilities' lease, without which Safe Harbor could not perform medical services, and Pinnacle could not collect management fees to operate the Facility.").)

The language in MSA §§ 2.1 and 2.2 talks about performing duties like providing health care services that require a license.  There is no duty to maintain the Facility's leases imposed on Safe Harbor by MSA §§ 2.1 or 2.2.

>        c.      MSA §§ 3.8, 3.8.1, and 8.5

MSA § 3.8 limits Pinnacle's authority in the ways listed in each subsection. Subsection 3.8.1 states that Pinnacle has no authority to "enter into, modify, terminate or exercise any options related to any real property leases or leases of capital assets …."  (Dkt. 58-1 at 8.)  MSA § 8.5 provides that Pinnacle and Safe Harbor agree not to "directly or indirectly interfere with circumvent, or attempt to circumvent, avoid, bypass or obviate each other's current and established relationships."  (Id. at 19.)

Pinnacle alleges that Safe Harbor breached this provision by fighting with the landlords over repairs to the leased premises:

Safe Harbor had mismanaged the relationship with the Landlords to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:25-cv-00703-KES                                      Date: April 7, 2026
                                                               Page 7

the point that they were beyond repair.  Safe Harbor destroyed the relationship by unreasonably allowing the Designated Facilities to fall into state of disrepair over many years and unreasonably creating a dispute with the Landlords over Safe Harbor's responsibility under the Leases to maintain the Designated Facilities at its own expense. […]

Safe Harbor finally allowed Pinnacle to send a single email to try to repair the relationship with the Landlords and extend the Leases, an action Pinnacle took because it considered the Leases essential to the viability of the business and its expectations under the MSA.  To try to salvage the relationship, Pinnacle offered the Landlords an extra $100,000 with no strings attached to extend the Leases.  But Safe Harbor had destroyed the relationship and the Landlords could not be persuaded to renew or extend Safe Harbor's Leases.

(SAC ¶¶ 44-45.)

None of the cited MSA terms imposed on Safe Harbor a duty to maintain the Facility's leases.  The mere fact that Pinnacle was not authorized to engage in lease negotiations or communicate directly with the landlords does not give rise to a contractual duty on Safe Harbor's part to maintain the leases.  Furthermore, Pinnacle does not allege facts showing that it had its own "current or established relationship" with the landlords when it signed the MSA.  To the contrary, Pinnacle alleges that it was not authorized to contact the landlords on its own.

### 3.    Failing to "Find a Suitable Replacement Location."

The SAC alleges that Safe Habor "breached the same provisions of the MSA" when it "failed to find a suitable replacement location to operate the business other than the Designated Facilities."  (SAC ¶ 71(C).)

Again, none of the above-cited provisions required Safe Harbor to maintain the Facility's leases, and Pinnacle terminated the MSA before the Facility's leases expired.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-00703-KES                              Date: April 7, 2026
                                                        Page 8

### 4.      Failing to "Maintain and Repair the Designated Facilities."

Pinnacles alleges that "Safe Harbor also breached the MSA by failing to maintain and repair the Designated Facilities."  (SAC ¶ 71(D).)

MSA § 6.1 defines Pinnacles "management fee."  (Dkt. 58-1 at 14.)  MSA § 6.2 acknowledges that Pinnacle "will incur substantial costs in providing services to SAFE HARBOR in connection with the Designated Facilities pursuant to this Agreement and such costs can vary to a considerable degree according to the extent of SAFE HARBOR's business and services," and that the management fee "constitutes reasonable fair market value compensation for the services."  (Id.)

Pinnacle contends that because the management fee was a percentage of the amount collected operating the Facility, that obligated Safe Habor to maintain and repair the Facility.  (FAC ¶ 48 (arguing that the "Management Fee itself was tied to the Designated Facilities" and citing MSA § 6.1).)  There is no connection between the cited "management fee" MSA sections and any duty by Safe Harbor to maintain and repair the Facility.  To the contrary, regarding maintenance and repairs, MSA § 3.1 obligates Pinnacle to undertake "all day-to-day administrative determinations and operations relating to the business of SAFE HARBOR at the Designated Facilities."  (Id. at 3.)  Those operations included "keeping, operating and maintaining the Designated Facilities in good operating condition."  (Id. at 4, MSA § 3.1.7.)

### 5.      Failing to Disclose Illegal Billing Disputes.

Pinnacle alleges that Safe Harbor breached MSA §§ 2.1 and 2.2 by failing to "disclose the active BCBS billing that Safe Harbor was on notice of until after Pinnacle independently learned about the matter months after the MSA's execution."  (SAC ¶ 71(E).)  According to Pinnacle, by failing to disclose past allegations of billing fraud that put Safe Harbor's future business operations at risk, Safe Harbor failed to cooperate in the manner required by MSA §§ 2.1 and 2.2. (Id.)

Again, the relevant language in MSA §§ 2.1 and 2.2 is as follows:

SAFE HARBOR shall cooperate with Manager during the term of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:25-cv-00703-KES                          Date: April 7, 2026
                                                    Page 9

this Agreement and shall perform any and all duties and obligations which must be performed by the party licensed to perform those obligations under applicable state and federal Laws, ordinances, rules and regulations.  Both Parties agree that they will take no actions or follow any course of conduct that is illegal or which will or may cause the SAFE HARBOR to lose its certification or licensure or its provider numbers under the terms of the applicable Laws.

(Dkt. 58-1 at 3.)

This language says nothing about disclosing prior illegal acts.  The duty to cooperate involves performing "any and all duties and obligations which must be performed by the party licensed to perform those obligations under applicable state and federal Laws, ordinances, rules and regulations."  Pinnacle has not cited any state and federal Laws, ordinances, rules and regulations that required Safe Harbor to disclose the pre-contract billing disputes at issue.

## B.    Breach of the Implied Covenant of Good Faith.

"In addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing."  Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809, 818 (1979) (citations omitted).[1]  "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement."  Id. (citations omitted) "The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes."  Id.

Pinnacle alleges that Safe Harbor breached the covenant of good faith and fair dealing by the same acts that allegedly breached the MSA.  (SAC ¶¶ 76, 78, 79.)  These allegations fails to state a claim for the reasons set forth above.

Pinnacle also alleges that "Safe Harbor acted unreasonably and in bad faith when Safe Harbor denied Pinnacle permission to meet directly with Safe Harbor's landlord and attempt to save the Facility's lease other than a single email."  (SAC ¶ 77.)  But the MSA clearly assigns authority to negotiate the leases to Safe

---

[1] The MSA is governed by California law.  (Dkt. 37-1 at 23, § 10.3.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-00703-KES                                                                Date: April 7, 2026
                                                                                           Page 10

Harbor.  (MSA § 3.8.1.)  Safe Harbor could breach the implied covenant by doing something expressly authorized by the MSA.

### C.      **Breach of Fiduciary Duty.**

"A fiduciary relationship is created where a person reposes trust and confidence in another *and* the person in whom such confidence is reposed obtains control over the other person's affairs."  Richard B. LeVine, Inc. v. Higashi, 131 Cal. App. 4th 566, 586 (2005) (emphasis added) (quoting Lynch v. Cruttenden & Co., 18 Cal. App. 4th 802, 809 (1993)).  Furthermore, "[t]he mere placing of a trust in another person does not create a fiduciary relationship."  Id.

The MSA specifically states that Safe Harbor and Pinnacle are neither partners nor joint venturers.  (Dkt. 37-1 at 22, § 10.1.)  Rather, Safe Harbor made Pinnacle its agent to carry out the MSA.  (Id. at 10, § 4.4.)

Pinnacle argues that it has sufficiently alleged that it relied on Safe Harbor to perform its contractual obligations under the MSA because Pinnacle could only receive management fees so long as the treatment center was operating.  (Dkt. 60 at 17-18.)  But even with the new allegations added to the SAC, Pinnacle has not alleged facts showing that Safe Habor exercised control over funds or property belonging to Pinnacle sufficient to demonstrate the existence of a fiduciary relationship.

## II.     CONCLUSION.

The Court GRANTS the Motion to Dismiss Pinnacle's SAC.  (Dkt. 59.)  The counterclaim for breach of fiduciary duty is dismissed *without* leave to amend.  The counterclaims for breach of contract and breach of the implied covenant are dismissed *with* leave to amend.  Pinnacle may file a third amended counterclaim by **April 27, 2026**.

Initials of Deputy Clerk jd